Michael **BERMAN,** as Trustee in Bankruptcy of **Le Beau Tours, Inc.,** Plaintiff,

v.

**Le BEAU INTER–AMERICA, INC.,** Robert S. Le Beau, Harry Le Beau, Winifred Le Beau, Doris A. Le Beau, S.T. Hui, Frank H. Seyer, Joseph W. Dye, H.S. Universal Tours, Inc., and Chemical Bank, **Defendants.**

**79 Civ. 5886(MEL).**

United States District Court, S.D. New York.

May 29, 1986.

Michael Berman, New York City, for plaintiff.

Beatrice H. Salten-Smith, New York City, for defendants Frank H. Seyer and Joseph W. Dye.

LASKER, District Judge.

In this suit, which was tried to the court, Michael Berman, as Trustee in Bankruptcy of Le Beau Tours, Inc. is suing Frank H. Seyer and Joseph W. Dye[1] under Section 720 of the Business Corporation Law of the State of New York to recover the sum of $765,000 for payments made by the bankrupt to Glendale, Inc., H.S. Universal Tours, Inc., Etsia, Inc., and Bay Point Yacht Club/The Grand Lagoon. Berman claims that these amounts were paid to the

---

**1.** This cause of action was originally instituted against Robert S. Le Beau, S.T. Hui and H.S. Universal Tours, Inc., as well as Messrs. Seyer and Dye. The cause of action against Robert S. Le Beau has been dismissed. *Berman v. Le Beau Inter-America, Inc.,* 509 F.Supp. 156 (S.D. N.Y.1981), *aff'd,* 679 F.2d 872 (2d Cir.1982). S.T. Hui was never served with process.

recipients without consideration at a time when the bankrupt was insolvent within the meaning of Section 102, sub-division (8) of the Business Corporation Law which reads:

"Insolvent" means being unable to pay debts as they become due in the usual course of the debtor's business.

Seyer and Dye were officers and directors of Le Beau Tours, Inc. and of its parent, H.S. Universal Tours, Inc., during the period from March 11, 1977, when H.S. Universal Tours, Inc. acquired the stock of Le Beau Tours, Inc. to April 5, 1978, when an involuntary petition in bankruptcy was filed against Le Beau Tours, Inc.

### I.

A) *Plaintiff's Case:*

At trial the sole witness for the plaintiff was Lawrence Miller, a certified public accountant. Mr. Miller has been an accountant for 26 years and is a member of the firm of Hornstein and Miller, who were appointed by the Bankruptcy Court as the accountants for the Trustee.

In October of 1978 Berman secured from Underwriters Salvage records relating to Le Beau Tours consisting of books, cash receipts, disbursement bank books and payroll for the period March 11, 1977 through June of 1978. In January of 1979 Mr. Miller visited Underwriters Salvage to see if there were any further records relating to Le Beau at the Underwriters' premises. He found none. The motive for the visit apparently was that there was reason to doubt whether the books originally received from Underwriters were the complete records of Le Beau, and in any event, it could not be certain that they were complete. Miller testified at length and related his testimony in detail to, and only to, the records secured from Underwriters and to resumes or summaries which Miller himself had prepared and which purported to analyze and sum up the meaning of the Le Beau records. The thrust of his testimony was to establish either that at the time of the payments made to Glendale, Etsia and

Bay Point Yacht Club/The Grand Lagoon, by or on behalf of Le Beau, Le Beau was insolvent within the definition of the Business Corporation Law or that, at a time when it was insolvent Le Beau had made payments to or for H.S. Universal Tours, Inc., its parent, for no consideration apparent on the face of the records.

Miller also testified in relation to the acquisition of the "Etsia" Company, acquired by H.S. Universal, but paid for in whole or in part by Le Beau, that Etsia's balance sheet at the time of the purchase established that Etsia had a deficit value and that Etsia's other records showed substantial losses prior to the acquisition. Furthermore, Miller testified that as to payments made by Le Beau to Glendale, H.S. Universal and Grand Lagoon/Bay Point, that there was no indication on the books of Le Beau as to any consideration it received for such payments.

On cross-examination it was brought out that Miller could not be certain that the records he had examined constituted all of the records of Le Beau or H.S. Universal Tours, Inc. or their affiliates and, indeed, the witness admitted that he had not attempted to discover all of the income or all of the cash receipts of Le Beau in the period in question. Mr. Miller also agreed that he had never attempted to determine whether any of the claims made against Le Beau in the bankruptcy proceedings were disputed.

B) *Defendants' Case:*

Both Dye and Seyer testified in their own defense. Dye, a man 81 years of age, testified to considerable experience in the fields of marketing, sales, public relations and administration of corporate affairs. He had had previous experience in the travel business and, in particular, had negotiated for two other companies, rental of space in hotels and on airlines. He had also participated in the acquisition of travel companies. He, along with Seyer and S.T. Hui, participated in the formation of H.S. Universal Tours, Inc. and the acquisition by it of Le Beau Tours, Inc. He was execu-

tive Vice President of Le Beau and devoted 75% of his time to its affairs. (Robert Le Beau, who had headed the company before its acquisition, was retained as Chief Executive Officer because of his long experience in the charter business.) Dye described Le Beau as a "wholesale" travel bureau "with a little retail thrown in". The charter end of the business chartered aircraft for groups, secured blocks of hotel rooms and performed other services involved in selling package arrangements to individual or professional groups.

In the chartering business it is necessary for a travel company, such as Le Beau, to obligate itself for plane and hotel reservations in advance and to put money "up front" to secure such reservations. On the other hand, a wholesale travel company is obligated only to guarantee sales which are actually received from a retailer.

Dye testified that H.S. Universal Tours, Inc., Le Beau's parent, was responsible for securing financing for Le Beau. ITT Glendale introduced Le Beau to various banks and established lines of credit for it.

Dye attempted to counter Miller's testimony by referring to a group of documents (collectively Defendants' Exhibit E) attached to a letter which he had written to Dr. Shiah, an official of the company, on March 29, 1978. It was difficult to draw any significant lessons from this exhibit, which was not prepared in relation to the questions at issue in this case. It did purport to confirm the legitimacy of some intra-company payments, or payments to third parties by one of the defendant companies on behalf of another, but did not cast light on whether when any such payments were made, Le Beau was insolvent.

As to the Etsia transaction, Dye explained that, Etsia being in the charter business and Le Beau in the wholesale business, Etsia was purchased for the purpose of increasing Le Beau's total volume of sales, and that the consideration which plaintiff received as a result of the Etsia sale consisted of an already booked volume and contacts with professional conventioneers with which Etsia had established relations. Etsia had 2 to 3 million dollars of business on the books at the time it was purchased by the defendants. The Etsia transaction was examined in advance by the defendants' accountants, Zolan and Helfand, and by their attorneys, the respected New York firm of Coudert Brothers. After the Etsia purchase, Etsia moved physically to Le Beau's offices and Le Beau took over the business which it had already booked and prepared for business at the Grand Lagoon in Panama City and sent brochures to professional groups previously served by Etsia.

Etsia had substantial debts at the time of the purchase, and these debts were assumed by Le Beau Tours, Inc. which made payments on them to airlines, among others, Pan American Airlines, the largest creditor. As to the Grand Lagoon/Bay Point Yacht Club transactions, the consideration received by Le Beau was to gain access to condominiums on a time-sharing basis at a very attractive resort which included in its amenities: golf, swimming, boating and a favorable climate. The price was set on the basis of market value at a 40% discount for condominium time which the defendants knew that they could rent at a profit.

It was anticipated that as a result of the Grand Lagoon/Bay Point Yacht Club transaction, Le Beau would make 25 to 40% on the deal which closed in or around September, 1977. In early 1978 the plaintiff began promoting for the 1978 season but bankruptcy intervened and prevented the exploitation of the opportunities. According to Dye the bankruptcy was caused by a catastrophic fall-off in business at the end of 1977 and beginning of 1978 when, as a result of unanticipated deregulation of the airlines, the airlines themselves went into the chartering and wholesale business— substantially undercutting the prices of travel agencies such as Le Beau.

Dye emphasized the care with which the Grand Lagoon transaction was entered into, stressing that Coudert Brothers had sent two members of its staff to investigate the facts, that the Zolan accountants

had examined the proposed arrangement before it was entered into and that members of the defendants' staff had visited the facilities to become acquainted with them at first hand before the transactions were approved.

With regard to the issue of whether Le Beau was insolvent at the time of the transactions, Dye testified that a number of the claims in bankruptcy against Le Beau were disputed by the company including claims by Caesar's Palace for over $31,-000., Interisland Holidays for over $25,000., and Interholiday Tours for over $220,000.

On cross-examination Dye agreed that he knew that at the time of the purchase Etsia had a book deficit of $1,670,000, but testified that he was confident that the profit to be made on the volume of business brought to the defendants by Etsia would be enough to repay Etsia's debts and make money for the defendants.

Frank Seyer testified as to his substantial business experience before becoming an officer of the defendant corporations. He was a founder of the Papermate Pen Company, having been the inventor of the ink which that pen used. After the Gillette Company bought out Papermate, Seyer joined a group which bought Eversharp-Schick. He was with that company from 1958 to 1972, ending, in his last seven years as President and Chief Executive Officer. He had served as a member of the Board of Directors of Technicolor Film Labs and Schick Electric Company.

Seyer's testimony fully supported that of Dye. He confirmed that ITT Glendale, to which payments had been made by Le Beau, was an investment banker which arranged lines of credit in New York and Washington for Le Beau and evolved a business plan to present to Le Beau's bank-lenders. It also secured for Le Beau a $300,000 line of credit at Bank Leumi and a credit line with the Chemical Bank. He did not dispute that Le Beau, H.S. Universal, Etsia and Bay Point/Grand Lagoon (after the latter three companies had been acquired) were run basically as one company.

He testified, as had Dye, that Bay Point and Grand Lagoon gave or gave promise of the opportunities of very deep discounts on over 300 units of condominiums (of one to three bedrooms) for a period of three years and that the plan for the acquisition of these facilities showed that a profit of $1 million dollars a year would result. The transaction was not entered into until after it had been reduced to writing and presented to the corporate defendants' bank-creditors, whose approval of the transaction was required and secured. This was in addition to the advice which the defendant corporations secured from their accountants and attorneys, Coudert Brothers. As Seyer put it, "a whole cadre of management headed by Robert Le Beau" visited Bay Point to examine the place. The justification for Le Beau Tours, Inc.'s making payments on this transaction was that it was to be the exploiter of the travel arrangements and would make the profit on the package tours.

As to the Etsia transaction, Seyer testified that its gross margins had been far higher than those normal in the industry and the defendant corporations were buying Etsia's sales at a big discount. The Etsia transaction was also submitted to ITT Glendale for approval and it presented the transaction to the banks from whom the defendant corporations borrowed. After the Etsia purchase, discrepancies in Etsia's accounts were discovered resulting in the withholding of payments to the previous Etsia stockholders and the cancellation of their employment contracts. Seyer confirmed that Le Beau Tour's drastic losses were the effect of deregulation when the airlines went into the charter business and "wiped out" independent charterers.

Seyer testified that Le Beau Tours was not insolvent at the time it commenced business on March 11, 1977 because its new owners had raised $350,000 of capital for its use.

On cross-examination Seyer testified that H.S. Universal Tours Inc. was the vehicle recommended by the lawyers and accountants to bring funds into the company com-

plex. It had very few employees and its address was the same as Le Beau's.

He was "sure" that the corporate defendants' accountants reported to the corporations on the desirability of the Etsia purchase.

Seyer's salary at Le Beau was $5,000 a month, which he received for a period of about six months.

## II.

Section 720 of the Business Corporation Law of New York provides that:

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

(1) To compel the defendant to account for his official conduct in the following cases:

(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

Berman as Trustee in Bankruptcy of Le Beau Tours, Inc. claims that by participating in the payments referred to above, Dye and Seyer violated their duties in the disposition of corporate assets and caused a waste of corporate assets.

Section 717 of the Business Corporation Law of the State of New York reads in relevant part:

A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances. In performing his duties, a director shall be entitled to rely on information, opinions, reports or statements including financial statements and other financial

data, in each case prepared or presented by:

\*    \*    \*    \*    \*    \*

(2) counsel, public accountants or other persons as to matters which the director believes to be within such person's professional or expert competence, or N.Y.Bus.Corp.Law § 717 (McKinney Supp. 1986).

Dye and Seyer testified not only that they approved the transactions in question in good faith, and that in discharging their duties they relied upon reports represented to them to be correct by certified public accountants (and by attorneys) but that the transactions now at issue were, at the time they were entered into, reasonably regarded by them as promising to yield profits to the corporate defendants and being in the interest of Le Beau Tours, Inc.

The critical issue to be determined is whether at the time the transactions were entered into they constituted a waste of the corporate assets. In defining what constitutes a waste of assets, the Appellate Division, Second Department has made it clear, *Aronoff v. Albanese*, 85 A.D.2d 3, 5, 446 N.Y.S.2d 368, 370 (1982), that payments of corporate funds, either where there is a lack of consideration or a "clearly inadequate consideration", constitutes an actionable waste. Moreover, citing *Rapoport v. Schneider*, 29 N.Y.2d 396, 328 N.Y.S.2d 431, 278 N.E.2d 642 (1972), "the directors would be liable for every form of waste of assets regardless of whether it was intentional or negligent." *Aronoff, supra*, 85 A.D.2d at 5, 446 N.Y.S.2d at 370. However, in order to establish an actionable waste of assets, it must be demonstrated that no person of ordinary sound business judgment would say that the corporation received fair benefit. If ordinary businessmen might differ on the sufficiency of consideration received by the corporation, the courts will uphold the transaction. The motives or personal benefit to the directors is also a relevant concern. The [plaintiff] must show that the directors must have acted with an intent to serve some outside interest, re-

gardless of the consequence. If there is a great disparity in values between the values expended and the benefits received, the courts will infer that the directors are guilty of improper motives, or at least recklessly indifferent to the stockholders' interests.

*Aronoff v. Albanese*, 85 A.D.2d at 5–6, 446 N.Y.S.2d at 371 (citations omitted).

Applying the criteria specified in *Aronoff* and *Rapoport*, I conclude that the plaintiff has failed to establish by a preponderance of the evidence that the defendants Dye and Seyer have violated their duties as directors or officers of Le Beau Tours, Inc. or wasted its corporate assets. I reach this conclusion for the following reasons:

■ 1. The plaintiff's case, consisting exclusively of the testimony of plaintiff's accountant, established at best, and could have been expected to establish at best, only (a) that Le Beau Tours, Inc. may have been insolvent on one or more of the occasions when it made the payments for which the suit is brought and (b) that Le Beau made one or more of such payments in circumstances which, unexplained, may have made it appear that its payments were made without consideration to Le Beau or, as stated in *Aronoff* that, unexplained, there appeared to be a "great disparity in values between the values expended and the benefits received" so that an inference might arise that the defendants were either guilty of improper motives or recklessly indifferent to the stockholders' (or creditors') interests. The plaintiff has failed, however, to put in any evidence, much less prove, that either Dye or Seyer intended "to serve some outside interest, regardless of the consequence." *Aronoff v. Albanese*, 85 A.D.2d at 6, 446 N.Y.S.2d at 371.

■ 2. Assuming that the plaintiff has established facts sufficient to raise an inference of improper behavior, however, I believe that the inference or presumption against Messrs. Dye and Seyer has been overcome by their testimony. Each of them was a man of substantial business experience and I credit the testimony of each of them as to his motives and expectations regarding the transactions under attack. Neither of them stood to profit in any significant way on a personal basis as the result of the consummation of the transactions under attack. I credit the testimony of each that at the time each transaction was consummated, it was sincerely believed by each of them that the proposed transaction would be profitable to Le Beau and that the purchases or payments were clearly in the interest of Le Beau.

3. I conclude that it cannot be said of these transactions, under the circumstances in which they were entered into, that "no person of ordinary sound business judgment would see that the corporation received fair benefit." Although "ordinary businessmen might differ on the sufficiency of consideration received" *Aronoff* teaches that under such circumstances the transaction is to be upheld.

4. I credit the testimony of both Messrs. Dye and Seyer that the reason that the transaction in question failed to be profitable to Le Beau, and the ultimate reason for Le Beau's bankruptcy lay in the complete change of business context caused by unforseen deregulation of the airlines which in turn put the airlines in a position to knock travel agents out of the box in the chartering business.

■ 5. Moreover, I conclude that Dye and Seyer had the right, under the provisions of Section 717 of the Business Corporation Law, since they were acting in good faith, to rely upon the financial statements of the accountants and of the reports of their highly qualified attorneys and of the approval given by their bank-lenders to the transactions which are here questioned.

This Memorandum constitutes my findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure and upon these findings and conclusions, I determine that Michael Berman as Trustee in Bankruptcy of Le Beau Tours, Inc. against Joseph W. Dye and Frank H. Seyer should be dismissed

and judgment entered for Joseph W. Dye and Frank H. Seyer.

It is so ordered.